01

02

03

04                          UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
05                                   AT SEATTLE

06  PROGRESSIVE NORTHERN INSURANCE )        CASE NO. C04-1308-MAT
    COMPANY, as Assignee and Subrogee for )
07  George Lassanske,                     )
                                          )
08           Plaintiff,                   )
                                          )        ORDER RE: DISPOSITIVE MOTIONS
09       v.                               )
                                          )
10  FLEETWOOD ENTERPRISES, INC., et al., )
                                          )
11           Defendants.                  )
    _____ )

12

13                       INTRODUCTION AND BACKGROUND

14          This matter concerns property damage sustained to a motor home owned by George and

15  Arlene Lassanske and insured by plaintiff Progressive Northern Insurance Company.  Plaintiff's

16  third amended complaint (Dkt. 24) raises negligence, breach of express and implied warranties,

17  strict liability, and breach of contract claims against the following defendants: (1) Fleetwood

18  Enterprises, Inc. and Fleetwood Motor Homes of Indiana, Inc. (collectively "Fleetwood") –

19  manufacturer/seller of the Fleetwood motor home purchased by the Lassanskes; (2) Spartan

20  Motors, Inc. and Spartan Motors Chassis, Inc. (collectively "Spartan") – manufacturer of chassis

21  and component parts of the motor home; (3) Cummins Engine, Co., Inc. ("Cummins") –

22  manufacturer of engine incorporated into the chassis of the motor home; (4) Cummins Great

ORDER RE: DISPOSITIVE MOTIONS
PAGE -1

01  Lakes, Inc. ("Great Lakes") – distributer of Cummins' products in Wisconsin and Upper Michigan

02  which performed repairs on the motor home pursuant to a Cummins' recall relating to an air

03  compressor defect in the motor home; and (5) Cummins NPower, LLC ("NPower") – entity which

04  Cummins maintains purchased the assets of Great Lakes after that entity ceased doing business

05  under that name on March 31, 2002 and that plaintiff asserts is the successor of Great Lakes

06  following a merger of the two entities.

07         On May 19, 2001, Cummins sent Mr. Lassanske a recall letter urging him to contact his

08  nearest "Cummins Distributor" to arrange for repairs relating to an air compressor defect in the

09  motor home.  (Dkt. 47, Ex. D.)  In response to that letter, Mr. Lassanske took his motor home

10  to Great Lakes, in Wisconsin.  Great Lakes performed the necessary repairs to the motor home

11  pursuant to Mr. Lassanske's warranty on June 29, 2001.  (Dkt. 35, Ex. A.)  Additionally, NPower

12  later performed engine work on the motor home in Wisconsin on May 10 and May 16, 2002.  *Id.*

13  The motor home caught fire and sustained damage while being driven in Washington State on May

14  30, 2002.

15         The Court must now consider four pending dispositive motions in this case:  (1)

16  Fleetwood's Motion for Summary Judgment (Dkt. 75); (2) Great Lakes/NPower's Motion to

17  Dismiss for Lack of General Personal Jurisdiction (Dkt. 88); (3) Cummins' Motion for Summary

18  Judgment (Dkt. 89); and (4) Plaintiff's Motion for Summary Judgment (Dkt. 82).  [1]  Having

19  considered pleadings filed in support of and in opposition to the motions, along with the remainder

20  of the record, and, being fully advised, the Court finds and concludes as follows:

21  ───────────────

22         [1] As indicated below, Spartan seeks to join the summary judgment motions filed by
    Fleetwood and Cummins.  (Dkts. 94 & 98.)

ORDER RE: DISPOSITIVE MOTIONS
PAGE -2

01

<u>DISCUSSION</u>

02 A.     <u>Fleetwood's Motion for Summary Judgment</u>

03         Summary judgment is appropriate when "the pleadings, depositions, answers to

04 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

05 genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

06 of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving

07 party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

08 showing on an essential element of his case with respect to which he has the burden of proof.

09 *Celotex*, 477 U.S. at 322-23.  "[A] party opposing a properly supported motion for summary

10 judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific

11 facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

12 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

13         Fleetwood explains that plaintiff's expert in this case, Michael Schoenecker, determined

14 that the fire in the motor home started because a positive cable coming from the battery shut off

15 switch and the grounding cable from the starter motor were routed too close together.  (Dkt. 72,

16 Ex. 1.)  Fleetwood notes that the Cummins engine installed in the motor home was supplied to it

17 as an integrated part of the chassis manufactured by Spartan.  It asserts its only involvement with

18 the chassis is to take the ends of the wires that lead from the chassis and attach the wires and the

19 chassis to the body of the motor home, but that, in so doing, Fleetwood does not move the

20 positive cable coming from the battery shut off switch or the grounding cable from the starter

21 motor, both of which are installed at the Spartan factory.  (Dkt. 71, ¶¶ 5-9) (stating that such wires

22 are clamped in place by Spartan.)) Fleetwood further notes that, according to Spartan's expert,

01 Allen K. Brethorst, the wires causing the fire in this motor home had to have been rerouted in

02 order to perform the recall repair on the engine compressor.  (Dkt. 72, Ex. 3.)  (*But see* Dkt. 85,

03 Ex. F5 at 26-27 (Cummins' expert, Michael Linscott, disagrees with Spartan's expert, and opines

04 that the relevant wires were located in place during the assembly of the chassis and that the

05 abrasion took place over the life of the unit.))

06       1.    <u>Product Manufacturer Claim</u>:

07      Fleetwood first argues its entitlement to dismissal in that it is not a "manufacturer" of a

08 "relevant product" as those terms are defined in the Washington Products Liability Act ("WPLA"),

09 RCW 7.72 *et seq*.  Pursuant to the WPLA:

> "Manufacturer" includes a product seller who designs, produces, makes, fabricates,
> constructs, or remanufactures the relevant product or component part of a product
> before its sale to a user or consumer. The term also includes a product seller or entity
> not otherwise a manufacturer that holds itself out as a manufacturer.
>
> A product seller acting primarily as a wholesaler, distributor, or retailer of a product
> may be a "manufacturer: but only to the extent that it designs, produces, makes,
> fabricates, constructs, or remanufactures the product for its sale. A product seller who
> performs minor assembly of a product in accordance with the instructions of the
> manufacturer shall not be deemed a manufacturer. A product seller that did not
> participate in the design of a product and that constructed the product in accordance
> with the design specifications of the claimant or another product seller shall not be
> deemed a manufacturer for the purposes of RCW 7.72.030(1)(a).

17 RCW 7.72.010 (2).  The relevant product "is that product or its component part or parts, which

18 gave rise to the product liability claim."  RCW 7.72.010 (3).

19      Fleetwood asserts that the relevant products in this case are the two wires on the chassis

20 that rubbed together to create the short causing the fire.  They further assert that those wires are

21 not modified after leaving Spartan's facility and that there is no evidence the portion of the motor

22 home manufactured by Fleetwood caused or contributed to the fire.  They cite *Parkins v. Van*

ORDER RE: DISPOSITIVE MOTIONS
PAGE -4

01 *Doren Sales, Inc.*, 45 Wn. App. 19, 24-25, 724 P.2d 389 (1986), as supporting that, where a

02 component of a final product can be identified as the cause of the injury, the component, rather

03 than the product as a whole, is the relevant product: "If we consider the entire assembly as a unit

04 and inquire whether there was liability as a component manufacturer or supplier, the 'relevant

05 product' is the component if the component gave rise to the product liability claim."  The court

06 in that case held: "Because Ms. Parkins was injured by machinery purchased from Van Doren, as

07 opposed to other equipment which made up the pear processing unit, those parts constitute

08 'relevant' products for the purposes of the act."  *Id.* at 25.  Fleetwood avers that, because it did

09 not manufacture the relevant product, it is entitled to dismissal of all claims against it based on its

10 alleged role as a manufacturer.

11      Plaintiff responds that Fleetwood was the primary manufacturer of the motor home,

12 including all of its component parts.  It asserts that Fleetwood's argument renders the term

13 "relevant product" in the WPLA meaningless because, according to that argument, only

14 component parts of products which malfunction could be deemed relevant products within the

15 ambit of the WPLA.  Plaintiff distinguishes *Parkins* as providing a method to determine whether

16 liability exists against any component manufacturer when the product as a whole causes injury;

17 that is, it should be used to determine whether component manufacturers of the Fleetwood motor

18 home should share liability, but is irrelevant as to whether Fleetwood itself is liable.

19      Plaintiff also argues that Fleetwood held itself out to the public as a manufacturer, noting

20 marketing materials and the "Fleetwood" logo on the back of the motor home.  *See* RCW 7.72.01

21 (2) ("The term also includes a product seller or entity not otherwise a manufacturer that holds

22 itself out as a manufacturer.")  It asserts that, without the provision pertaining to entities holding

ORDER RE: DISPOSITIVE MOTIONS
PAGE -5

01    themself out to the public as manufacturers, for example, Ford Motor Company could successfully

02    argue that it is not liable as a manufacturer for a fire in a Mustang because it did not actually

03    produce the Delco spark plug that malfunctioned and caused the fire destroying the automobile.

04        Finally, plaintiff asserts that the question of whether Fleetwood performed only "minor

05    assembly" is a finding properly reserved for resolution by the jury. *See* RCW 7.72.01 (s) ("A

06    product seller who performs minor assembly of a product in accordance with the instructions of

07    the manufacturer shall not be deemed a manufacturer.") Plaintiff adds that, given that the engine

08    is a major component of the motor home, its incorporation into the motor home could hardly be

09    called minor. Plaintiff also notes that Fleetwood designed the motor home, meaning it necessarily

10    had to design the motor home to incorporate installation of the chassis and engine.

11        In its reply, Fleetwood asserts that the Washington Legislature intended the WPLA to

12    place liability only on those entities that actively caused injury; that is, on those manufacturers who

13    had a role in the formation of the defective part. It avers that the WPLA definition of relevant

14    product allows for liability to be placed on either the manufacturer of the whole product,

15    component parts, or both, depending on which of those entities was actively involved in the design

16    or construction of the product that caused the injury. Fleetwood avers that, otherwise, the statute

17    would read: "product *and* its components that give rise to the claim." RCW 7.72.010 (2)

18    (emphasis added). It argues that, where a specific component can be identified as the sole cause

19    of the injury and there is no evidence that the manufacturer of the end product altered that

20    component or contributed to the injury in any way, that manufacturer is entitled to dismissal.

21    Fleetwood also notes that the three experts designated by plaintiff in this case opined that they had

22    no opinions or evidence that Fleetwood acted or failed to act in a manner that caused or

ORDER RE: DISPOSITIVE MOTIONS
PAGE -6

01 contributed to the fire.

02       As noted by plaintiff, *Parkins* did not involve a determination as to whether *either* a

03 component part manufacturer *or* the overall manufacturer of a product was liable; the plaintiff in

04 that case sued only the manufacturer of the component part. However, *Parkins* nonetheless

05 supports the conclusion that where a particular component can be identified as giving rise to the

06 claim, that component, rather than the end product as a whole, may be considered the relevant

07 product. *See* 45 Wn. App. at 19, 24-25 ("If we consider the entire assembly as a unit and inquire

08 whether there was liability as a component manufacturer or supplier, the 'relevant product' is the

09 component if the component gave rise to the product liability claim."; "Because Ms. Parkins was

10 injured by machinery purchased from Van Doren, as opposed to other equipment which made up

11 the pear processing unit, those parts constitute 'relevant' products for the purposes of the act."

12 45 Wn. App. 19, 24-25. *Accord Sepulveda-Esquivel v. Central Machine Works, Inc.*, 120 Wn.

13 App. 12, 18-19, 84 P.3d 895 (2004) (citing *Parkins* for the same principles). Plaintiff's argument,

14 in contrast, reads out the disjunctive aspect of the definition of relevant product: "that product *or*

15 its component part or parts, which gave rise to the product liability claim." RCW 7.72.010 (3)

16 (emphasis added). *See also Cadwell Indus's, Inc. v. Chenbro America, Inc.* , 119 F. Supp. 2d

17 1110, 1114 (E.D. Wash. 2000) ("The WPLA defines the 'relevant product' as that product or

18 component which gave rise to the product liability claim.") (emphasis removed from original).

19       Significantly, plaintiff presents no evidence showing that the overall motor home, as

20 opposed to the chassis, engine, and/or the relevant wires, gave rise to any damage. (*See generally*

21 Dkt. 85 (declaration of plaintiff's expert.)) Plaintiff, therefore, fails to establish that Fleetwood is

22 properly considered a manufacturer of the relevant product(s) in this case.

01        The next question is whether Fleetwood could be deemed "a product seller or entity not

02 otherwise a manufacturer that holds itself out as a manufacturer."  RCW 7.72.010(2).  Clearly,

03 Fleetwood holds itself out as the manufacturer of the motor home as a whole.  However, there is

04 no evidence Fleetwood holds itself out as the manufacturer of the chassis, engine, and/or the

05 relevant wires.  Accordingly, plaintiff also fails to establish that Fleetwood held itself out as the

06 manufacturer of the relevant product(s) in this case.

07        Finally, there remains the question of whether Fleetwood performed only "minor assembly

08 of a product in accordance with the instructions of the manufacturer[,]" and, therefore, should

09 "not be deemed a manufacturer." RCW 7.72.010 (2).  Fleetwood incorporated the chassis into the

10 motor home.  As explained by its expert, Doug Hass:

11            These wires to the starter and the surrounding wires (meaning secured to the frame
            in the same local area) are originally selected, designed, engineered, fabricated per
            Spartan specifications and installed by Spartan Motors of Charlotte, Michigan. . .
12            Fleetwood does not alter the referenced wires at all (meaning re-route, 'tap into", cut,
            splice, disconnect and reattach or change location) for any purpose.  During this time
13            period the motor home was manufactured Fleetwood would have purchased the
            completed and fully functional chassis directly from Spartan Motors.  A completed
14            assembly and fully operational is defined as a chassis that is able to be started and
            driven as it is received.  Fleetwood would have 'tapped into' the electrical system at
15            predetermined locations with specific and dedicated connectors per design
            requirements while following the 'Spartan Body Builders Handbook.' . . . As part of
16            the final assembly Fleetwood builds the 'box' on top of the chassis and it becomes a
            completed motor home.
17

18 (Dkt. 33, Ex. A.)  Also, plaintiff's expert states: "My investigation in this case revealed that the

19 positive battery cable and the ground cable were installed on the vehicle as part of the chassis

20 manufacture by Spartan Chassis, Inc."  (Dkt. 85 at 8.)

21        Given the above, it is not at all clear, as argued by plaintiff, that this minor assembly issue

22 raises a question of fact.  *Cf. Almquist v. Finley School District No. 53*, 114 Wn. App. 395, 404,

ORDER RE: DISPOSITIVE MOTIONS
PAGE -8

57 P.3d 1191 (2002) (rejecting argument that whether a school district which used tainted beef to make tacos was a manufacturer was a question of fact, given that the material facts – that the district stored, thawed, cooked, drained, rinsed, seasoned, and mixed the frozen beef to make tacos – were not disputed, and constituted producing, making, fabricating, and constructing under the definition of a manufacturer of a relevant product).  Instead, the facts show that, if anything, Fleetwood's involvement with the relevant product(s) in this case involved nothing more than minor assembly, thereby excluding them from the definition of a manufacturer of the relevant product under the WPLA.

      2.    <u>Product Seller Claim</u>:

    Pursuant to the WPLA:

(1)    Except as provided in subsection (2) of this section, a product seller other than a manufacturer is liable to the claimant only if the claimant's harm was proximately caused by:

(a) The negligence of such product seller; or

(b) Breach of an express warranty made by such product seller; or

(c) The intentional misrepresentation of facts about the product by such product seller or the intentional concealment of information about the product by such product seller.

(2)    A product seller, other than a manufacturer, shall have the liability of a manufacturer to the claimant if:

(a) No solvent manufacturer who would be liable to the claimant is subject to service of process under the laws of the claimant's domicile or the state of Washington; or

(b) The court determines that it is highly probable that the claimant would be unable to enforce a judgment against any manufacturer; or

(c) The product seller is a controlled subsidiary of a manufacturer, or the

ORDER RE: DISPOSITIVE MOTIONS
PAGE -9

01    manufacturer is a controlled subsidiary of the product seller; or

02    (d) The product seller provided the plans or specifications for the manufacture
      or preparation of the product and such plans or specifications were a
03    proximate cause of the defect in the product; or

04    (e) The product was marketed under a trade name or brand name of the
      product seller.

05

06    RCW 7.72.040.

07          Fleetwood avers the absence of any of the above-described conditions to create potential

08    liability on its part.  It asserts a lack of any evidence of negligence and that none of the expert

09    witnesses have suggested that the cause of the fire was linked to any of its actions.

10          Plaintiff counters that subsections (2)(a) and (2)(e) of RCW 7.72.040 apply in this case to

11    hold Fleetwood liable as a product seller.  With respect to the latter, plaintiff notes that the

12    product was clearly marketed under Fleetwood's brand name, as the "Fleetwood American

13    Eagle."  With respect to the former, plaintiff asserts that, because Great Lakes is no longer in

14    business, there are substantial grounds to hold Fleetwood liable as a product seller.

15          First, plaintiff's solvency argument lacks merit in that there are other solvent manufacturers

16    who could be held accountable, including Spartan and Cummins.  Second, because  plaintiff's

17    trade/brand name argument is contingent on a determination that the motor home itself is the

18    "relevant product," and because the Court does not find as such, subsection (2)(e) of RCW

19    7.72.040 also does not apply.  Thus, the Court concludes that Fleetwood is not properly

20    considered liable as a product seller under the WPLA.[2]

21    _____

22          [2] Fleetwood also argues it is not liable as a manufacturer for damages caused as a result
      of the recall repair, which occurred after the motor home left Fleetwood's control.  *See Padron*

ORDER RE: DISPOSITIVE MOTIONS
PAGE -10

01          3.          Defect at Time of Manufacture:

02          Plaintiff additionally argues Fleetwood's liability based on a defect existing at the time of

03   manufacture, quoting the WPLA:

> A product manufacturer is subject to strict liability to a claimant if the claimant's harm
> was proximately caused by the fact that the product was not reasonably safe in
> construction or not reasonably safe because it did not conform to the manufacturer's
> express warranty or to the implied warranties under Title 62A RCW. . . . A product
> is not reasonably safe in construction if, *when the product left the control of the*
> *manufacturer*, the product deviated in some material way from the design
> specifications or performance standards of the manufacturer, or deviated in some
> material way from otherwise identical units of the same product line.

09   RCW 7.72.030(2)(a) (emphasis added).  Plaintiff asserts that it is undisputed that the motor home

10   was defective at the time it left Fleetwood, as evidenced by the recall.  Plaintiff states that this

11   defect affected the driver's ability to steer, thus rendering the motor home not reasonably safe.

12   Plaintiff argues that, but for the defect, the recall would not have been issued, and the related work

13   would not have been performed.

14          Fleetwood responds that the defect in the Cummins engine is irrelevant because it did not

15   proximately cause the fire.  It asserts that that defect was the potential for the failure of the

16   compressor that could lead to loss of power steering – which was not the proximate cause of

17   damage in this case.  RCW 7.72.030(1) ("A product manufacturer is subject to liability to a

18   ────────────────────

19   *v. Goodyear Tire & Rubber Co.*, 34 Wn. App. 473, 476 (1983) (a "plaintiff may be barred from
20   recovery if the product underwent a substantial change in its condition after leaving the
     manufacturer.")  However, given the determination that Fleetwood is not properly characterized
21   as either a manufacturer or seller of the relevant product under the WPLA, the Court need not
     address this argument.  Moreover, as discussed below, causation in this case presents an issue of
22   material fact.  For this reason, Spartan's attempt to join in Fleetwood's motion based on the theory
     of subsequent modification of the wire must also be denied.

ORDER RE: DISPOSITIVE MOTIONS
PAGE -11

01  claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in

02  that the product was not reasonably safe as designed or not reasonably safe because adequate

03  warnings or instructions were not provided.") Fleetwood notes that proximate cause requires both

04  cause in fact and proximity between the negligent act and injury. *Mehrer v. Easterling*, 71 Wn.2d

05  104, 108, 426 P.2d 843 (1967).  Noting expert opinions that it is likely the wires were moved

06  during the recall work, Fleetwood asserts that Cummins' negligence is an independent intervening

07  cause and the proximate cause of the fire.

08      Plaintiff does not present any evidence that the recall-related defect proximately caused

09  the fire.  Also, this argument ultimately rests on the assumption that the wires were re-routed

10  during the repair necessitated by the recall, and that this re-routing caused the fire.  However, as

11  discussed below, this issue raises a question of material fact. *See Almquist*, 114 Wn. App. at 406

12  (proximate cause is generally a question of fact for the jury; in particular, "[c]ause in fact requires

13  a direct unbroken sequence between some act and the complained of event[]" and is "generally

14  a question for the jury.")  Accordingly, the Court rejects plaintiff's argument that Fleetwood is

15  liable based on a defect at the time of the manufacture of the motor home.

16  B.   Great Lakes/NPower's Motion to Dismiss for Lack of General Personal Jurisdiction

17      The Court previously determined that plaintiff failed to establish specific personal

18  jurisdiction over Great Lakes and NPower, but found it appropriate to allow jurisdictional

19  discovery on the issue of general personal jurisdiction based on the existence of an alter ego

20  relationship between Cummins and Great Lakes/NPower.  (Dkt. 58)  Great Lakes/NPower now

21

22

ORDER RE: DISPOSITIVE MOTIONS
PAGE -12

01 move to dismiss based on a lack of general personal jurisdiction.[3]

02 Plaintiff bears the burden of establishing personal jurisdiction over defendants. *Doe v.*

03 *Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). Where, as here, the Court elects to resolve the

04 motion on the parties' briefs, exhibits, and affidavits, rather than hold an evidentiary hearing,

05 plaintiff need only "make a prima facie showing of jurisdictional facts in order to defeat [the]

06 motion to dismiss." *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 912

07 (9th Cir. 1990). "'That is, the plaintiff need only demonstrate facts that if true would support

08 jurisdiction over the defendant.'" *Doe*, 248 F.3d at 922 (quoting *Ballard v. Savage*, 65 F.3d 1495,

09 1498 (9th Cir. 1995)). The Court takes plaintiff's version of the facts as true for purposes of a

10 Rule 12(b)(2) motion to dismiss, and resolves any conflicts in the evidence set forth in the

11 affidavits in plaintiff's favor. *Id.*

12 The exercise of personal jurisdiction over a nonresident defendant requires both the

13 satisfaction of the requirements of the forum state's long-arm statute, and the requirements of

14 federal due process. *Chan v. Society Expeditions* , 39 F.3d 1398, 1404-05 (9th Cir. 1994).

15 Washington's long-arm statute confers personal jurisdiction to the extent due process allows. *Id.*

16 at 1405. "Where the forum's long-arm statute is coextensive with due process, as is Washington's,

17 the focal inquiry becomes whether an exercise of jurisdiction comports with Constitutional due

18 process." *IP Innovation, L.L.C. v. RealNetworks, Inc.*, 310 F. Supp. 2d 1209, 1212 (W.D. Wash.

19

20 [3] Plaintiff argues that this motion was untimely, noting that Great Lakes/NPower wrongly noted this dispositive motion for three Fridays, as opposed to the four Fridays required by Local

21 CR 7(d)(3). However, a motion wrongly noted is not, for that reason, untimely. Plaintiff also generally avers prejudice at having to reply a week earlier than required by the local rule.

22 However, plaintiff made no attempt to correct the noting date or to simply respond to the motion within the proper time frame.

ORDER RE: DISPOSITIVE MOTIONS
PAGE -13

01  2004) (citing, *inter alia*, *Chan*, 39 F.3d at 1405 and Wash. Rev. Code § 4.28.185).

02  Satisfaction of due process occurs when a nonresident defendant has "'certain minimum

03  contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions

04  of fair play and substantial justice."'" *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466

05  U.S. 408, 414 (1984) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)

06  (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940))). Jurisdiction may be either general or

07  specific. Also, in addition to establishing the requisite contacts, the assertion of jurisdiction must

08  be found reasonable. *Doe*, 248 F.3d at 925 (citing *Amoco Egypt Oil Co. v. Leonis Navigation

09  Co.*, 1 F.3d 848, 851 (9th Cir. 1993)).

10  General jurisdiction, at issue here, requires that contacts with the forum be "continuous

11  and systematic," and applies whether or not the cause of action arises from those contacts.

12  *Helicopteros Nacionales de Columbia, S.A.* , 466 U.S. at 414-16. While it is undisputed that

13  Cummins is subject to general jurisdiction in this Court, the question remains as to whether Great

14  Lakes/NPower are likewise subject to this Court's jurisdiction based on their relationship with

15  Cummins.

16  It is well established that the mere existence of a parent-subsidiary relationship is not

17  sufficient to confer personal jurisdiction over the parent based on the subsidiary's forum contacts.

18  *Doe,* 248 F.3d at 925. "[A] parent corporation may be directly involved in the activities of its

19  subsidiaries without incurring liability so long as that involvement is 'consistent with the parent's

20  investor status[.]'" *Id.* at 926 (quoting *United States v. Bestfoods*, 524 U.S. 51, 72 (1998)).

21  "Appropriate parental involvement includes: 'monitoring of the subsidiary's performance,

22  supervision of the subsidiary's finance and capital budget decisions, and articulation of general

ORDER RE: DISPOSITIVE MOTIONS
PAGE -14

01  policies and procedures[.]'" *Id.* (quoting *Bestfoods*, 524 U.S. at 72).

02     However, the contacts of a subsidiary may be imputed to the parent under two exceptions

03  – where the subsidiary is the parent's alter ego, or where the subsidiary acts as the parent's general

04  agent. *Harris Rutsky & Co. Ins. Svcs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th

05  Cir. 2003). "An alter ego or agency relationship is typified by parental control of the subsidiary's

06  internal affairs or daily operations." *Doe*, 248 F.3d at 926.

07     As indicated above, plaintiff previously argued general jurisdiction based on an "alter ego"

08  relationship between Cummins as a parent corporation and Great Lakes and NPower as Cummins'

09  subsidiaries. Great Lakes and NPower dispute the existence of such a relationship in their motion.

10  Also, although allowing jurisdictional discovery, the Court previously stated:

11     In this case, plaintiff does not proffer any evidence indicating the involvement of
       Cummins in the day-to-day activities of Great Lakes or NPower.  Moreover, while
12     pointing to their use of a "common marketing image" and the fact that Great Lakes
       and NPower marketed Cummins' engines as their exclusive distributors (*see* Dkt 47,
13     Exs. B & C), plaintiff fails to show Cummins used these entities as marketing conduits
       to shield itself from liability.  In fact, given that Cummins is itself subject to the
14     general jurisdiction of this Court, its relationship with Great Lakes and NPower
       cannot be said to shield it from liability.  Plaintiff also fails to put forth evidence
15     supporting the conclusion that the entities in any respect failed to observe corporate
       formalities necessary to maintain corporate separateness.

16

17  (Dkt. 58 at 7-8.)

18     However, in response to defendants' current motion, plaintiff abandons the alter ego

19  argument, arguing instead that the general agency exception applies.  Plaintiff further posits that,

20  should Cummins agree that it is legally responsible for the warranty recall repair work performed

21  by Great Lakes/NPower, plaintiff would agree to dismissal of those entities.  It further asserts

22  Cummins' apparent intention to argue, upon dismissal of Great Lakes and NPower, that it cannot

ORDER RE: DISPOSITIVE MOTIONS
PAGE -15

01  be held liable for the negligence of entities no longer parties to this lawsuit.[4]

02       Cummins declines to agree that is legally responsible for work performed by Great Lakes,

03  arguing plaintiff can always choose to pursue an action against Great Lakes and NPower in

04  Wisconsin or elsewhere.  The issue to be decided, therefore, is whether Great Lakes and NPower

05  can be properly considered the agents of Cummins for the purposes of establishing general

06  personal jurisdiction.

07       In order to satisfy the agency test for purposes of establishing personal jurisdiction, the

08  plaintiff must show: "'that the subsidiary functions as the parent corporation's representative in

09  that it performs services that are "sufficiently important to the foreign corporation that if it did not

10  have a representative to perform them, the corporation's own officials would undertake to perform

11  substantially similar services."'"  *Doe*, 248 F.3d at 928-29 (quoting *Chan*, 39 F.3d at 1405

12  (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 423 (9th Cir. 1977))).

13  "Consequently, '[t]he question to ask is . . . whether, in the truest sense, the subsidiar[y's]

14  presence substitutes for the presence of the parent.'" *Id.*  (quoting *Gallagher v. Mazda Motor of*

15  *Am., Inc.*, 781 F. Supp. 1079, 1084 (E.D. Pa. 1992)).

16       Plaintiff points out that Cummins performs none of the warranty repair work on the

17

_____

18       [4] Plaintiff also notes that all Cummins entities are represented by the same law firm and
19  utilize the same experts, eliminating any economic rationale for Great Lakes and NPower to avoid
traveling to Seattle and presenting a defense. While defendants respond that costs are not a
20  component in this Court's due process analysis, the Court notes that costs are relevant to the
reasonableness inquiry required in the jurisdictional assessment.  *See, e.g., Glencore Grain*
21  *Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1125 (9th Cir. 2002) (noting,
among other factors to be considered in determining whether the exercise of jurisdiction would
22  be reasonable, the burden on the defendant of defending in the forum).  However, plaintiff must
first establish sufficient minimum contacts.

ORDER RE: DISPOSITIVE MOTIONS
PAGE -16

01  engines it sells, that owners of those engines are required to have warranty work performed at a

02  Cummins-authorized service facility, such as Great Lakes, and that Cummins paid Great Lakes to

03  perform the warranty work on the Lassanske motor home.  Plaintiff argues that those repairs are

04  sufficiently important to Cummins such that, if they did not have Great Lakes/NPower to perform

05  them, Cummins would undertake those services themselves.  It argues that, without Great

06  Lakes/NPower, Cummins' warranties would be rendered meaningless and void *ab initio*.  Plaintiff

07  also notes that Cummins is the 100% shareholder of Great Lakes, and describes Great Lakes and

08  NPower as mere extensions of Cummins in essentially functioning as Cummins' warranty repair

09  department.

10       Defendants respond that agency based on the warranty work, to the extent it exists,

11  confers jurisdiction on Cummins in Wisconsin, where the repairs were completed.  They posit that,

12  were the Court to adopt plaintiff's reasoning, a Firestone in Springfield, Massachusetts, for

13  example, would be subject to personal jurisdiction in this Court simply as a result of performing

14  authorized Cummins' repair work that happened to make its way to Washington State.

15       As asserted by plaintiff, Cummins is obligated to make repairs pursuant to its warranties,

16  relies on its authorized facilities to make those repairs, and requires the holders of the warranties

17  to utilize those facilities to make the repairs.  However, it nonetheless does not follow that

18  Cummins would perform the repairs in the absence of Great Lakes.  That is, rather than

19  performing the repair work itself, Cummins could presumably authorize a different entity –

20  including one having no other association with Cummins – to perform repair work.

21       If anything, plaintiff's argument is more reasonably considered as asserting Cummins'

22  respondeat superior liability for the warranty work performed by Great Lakes/NPower.  However,

ORDER RE: DISPOSITIVE MOTIONS
PAGE -17

01    while well taken as a theory of liability, the Court need not address the issue in determining

02    whether this Court has general personal jurisdiction over Great Lakes/NPower.

03          Morever, even if it could be said that Cummins and Great Lakes/NPower have an agency

04    relationship sufficient to confer general personal jurisdiction over Cummins in Wisconsin for the

05    work performed by Great Lakes/NPower in that state, it also does not follow that the converse

06    application of general personal jurisdiction over Great Lakes/NPower in Washington State would

07    apply in this case.  As indicated in the Court's previous decision, "[t]he activities of the parent

08    corporation [in the forum state] are irrelevant absent some indication that 'the formal separation

09    between parent and subsidiary is not scrupulously maintained.'" *Newman v. Comprehensive Care*

10    *Corp.*, 794 F. Supp. 1513, 1519 (D. Or. 1992) (quoting *Uston v. Grand Resorts, Inc.*, 564 F.2d

11    1217, 1218 (9th Cir.1977)).  Here, as before, plaintiff makes no showing that the formal

12    separation of the entities in question is not scrupulously maintained.  *See, e.g., Harris Rutsky &*

13    *Co. Ins. Servs., Inc.*, 328 F.3d at 1135 ("100% control through stock ownership does not by itself

14    make a subsidiary the alter ego of the parent.")  (*See also* Dkt. 58 at 7-8 ("Plaintiff also fails to

15    put forth evidence supporting the conclusion that the entities in any respect failed to observe

16    corporate formalities necessary to maintain corporate separateness."))

17          In sum, the Court finds no basis for the extension of jurisdiction over Great Lakes/NPower

18    in this Court.  As such, the Court concludes that plaintiff's claims against Great Lakes/NPower

19    should be dismissed based on a lack of general personal jurisdiction.

20    C.    Cummins' and Plaintiff's Motions for Summary Judgment

21          Cummins and plaintiff raise a variety of arguments in support of their motions for summary

22    judgment.  Spartan seeks to join Cummins' motion.  However, the Court concludes that these

ORDER RE: DISPOSITIVE MOTIONS
PAGE -18

01  motions cannot be resolved on summary judgment given the existence of at least one issue of

02  material fact.

03        As indicated above, there is a dispute among the parties and their various experts regarding

04  causation.  Spartan's expert, Brethorst, states:

05        Personal knowledge of this particular recall and the requirements of space needed in
        the general area of the compressor to facilitate removal and replacement of the
06        compressor suggest that the wire and cable bundles that were in the area of the
        compressor were moved and repositioned in order to secure adequate room for repair
07        due to close tolerances of the engine bay.

08        During the above repair there is no doubt that the cable in question was moved and
        repositioned to facilitate the recall.  Damage resulted to the cable during or after the
09        repair as a result of the means or way that the cable was then routed and secured.

10  (Dkt. 72, Ex. 2.)  (*See also* Dkt. 72, Ex. 3 (Brethorst concluded: "I believe that the integrity of

11  the Spartan wiring was compromised during the recall and resulted in the loss.  I could find no

12  fault or defect with any Spartan component or part.")  Fleetwood's expert, John Powell, concurs,

13  stating: "The conductors in the area described in the Brethorst report were most probably moved,

14  rerouted, or repositioned during the removal and replacement of the air compressor during the

15  repairs that were the subject of the Cummins recall campaign."  (Dkt. 85, Ex. F4 at 4.)

16        However, the expert for Cummins, Michael Linscott, disagrees.  Linscott first asserts that

17  Brethorst provided no evidence to validate his purported personal knowledge.  (Dkt. 85, Ex. F5

18  at 26.)  He further states:

19        Based upon the proximate location of where the wire crossed over the frame on the
        two units, the evidence indicates that the wire was where it was located during chassis
20        assembly.  The exemplar unit [looked at by Linscott]  had not been in for service on
        Warranty Campaign 0111.  This evidence contradicts the unsupported allegations that
21        representatives from Cummins-Great Lakes in any way separated any cable bundles
        that created any conditions, resulting in this fire.  Moreover according to Cummins,
22        Inc., distributors, such as Cummins-Great Lakes, would not have been instructed to

ORDER RE: DISPOSITIVE MOTIONS
PAGE -19

01    move wires during Warranty Campaign 0111.  However, based on the observations
02    on the exemplar vehicle and the opinions set forth in Mr. Brethorst's report, if the
      initiating event was at the cable from the master switch where it crossed over the
03    frame, the routing of the wire in an unsecured method over the frame was not the
      result of Cummins Great Lakes actions.  If abrasion took place it was over the life of
04    the unit.

05    (*Id.* at 27.)  Additionally, plaintiff's expert, Schoenecker, declines any independent knowledge as

06    to whether the relevant cable was in fact re-routed during the recall, pointing to either original

07    placement or re-routing during the recall work as the cause of the fire.  (Dkt. 85 at 10 and Ex.

08    C2.)[5]

09            This dispute raises a genuine issue of material fact and, therefore, precludes a grant of

10    summary judgment.  Moreover, plaintiff's argument that it should be granted summary judgment

11    while the remaining defendants "fight it out" amongst themselves is not well taken.  Although the

12    Court declines to delve into plaintiff's various claims and arguments, it notes that the motions and

13    responding documents raise both the possibility of additional issues of material fact and pertinent

14    questions regarding plaintiff's claims.  As such, the Court does not find a basis for granting

15    plaintiff's motion for summary judgment.

16                                        CONCLUSION

17            For the reasons described above, Fleetwood's Motion for Summary Judgment (Dkt. 75)

18    _____

19        [5] Spartan cites a letter from Schoenecker in response to Brethorst's report as agreeing
      "that the positive cable from the disconnect switch (mechanic's switch) was not routed correctly
20    nor secured properly as a result of the work performed during the recall." (Dkt. 94, Ex. 3.)
      However, Schoenecker disputes the depiction of the letter described by Spartan.  (*See* Dkt. 104,
21    Ex. 2 (stating the portion of the letter quoted was merely intended to convey Brethorst's assertion
      and reiterating statement in previous declaration and his testimony that the fire resulted either as
22    a result of the original positioning of the wiring or the re-routing of the wiring during the recall
      work.))

ORDER RE: DISPOSITIVE MOTIONS
PAGE -20

01  and Great Lakes/NPower's Motion to Dismiss for Lack of General Personal Jurisdiction (Dkt. 88)

02  are hereby GRANTED, while Cummins' Motion for Summary Judgment (Dkt. 89), joined by

03  Spartan (Dkt. 98), and Plaintiff's Motion for Summary Judgment (Dkt. 82) are hereby DENIED

04  based on the existence of at least one genuine issue of material fact.

05          DATED this  14th  day of April, 2006.

06

07                                                          _____
                                                            Mary Alice Theiler

08                                                          United States Magistrate Judge

09

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER RE: DISPOSITIVE MOTIONS
PAGE -21